## JAMES HERMAN ANDERSON v. COMMISSIONER OF HIGHWAYS.

126 N. W. (2d) 778.

February 14, 1964—No. 39,028.

*Ben R. Toensing,* for appellant.

*Walter F. Mondale,* Attorney General, *Perry G. Voldness,* Deputy Attorney General, and *John R. Murphy,* Special Assistant Attorney General, for respondent.

MURPHY, JUSTICE.

This is an appeal from a judgment of the district court denying a petition to set aside a 1-year suspension of a driver's license.

Under authority of Minn. St. 171.18, the commissioner of highways suspended petitioner's license on the ground that he was a habitual violator of traffic laws. That statute provides, in part, as follows:

"The commissioner shall have authority to and may suspend the license of any driver without preliminary hearing upon a showing by department records or other sufficient evidence that the licensee:

\*    \*    \*    \*    \*

"(4) Is an habitual violator of the traffic laws."

From the record it appears that petitioner's driver's record is as follows:

"October 20, 1953. Driving while intoxicated in the City of Edina, Minnesota.

"October 20, 1953. Driving with no driver's license in possession in the City of Edina, Minnesota.

"November 19, 1954. Driving after suspension of driver's license in the City of Shakopee, Minnesota.

"April 8, 1955. Driving after suspension of driver's license in the City of Shakopee, Minnesota.

"June 25, 1955. Driving with no driver's license in the City of Chaska, Minnesota.

"April 17, 1959. Driving while intoxicated in the City of Hopkins, Minnesota.

"July 29, 1959. Driving after revocation of license in the City of Shakopee, Minnesota.

"January 9, 1961. Driving after suspension of driver's license in the City of Bloomington, Minnesota.

"January 9, 1961. Driving through a school stop sign in the City of Bloomington, Minnesota.

"March 24, 1962. Driving after suspension of driver's license in the City of Shakopee, Minnesota."

It further appears from the record that subsequent to the offense of March 24, 1962, petitioner appeared with counsel in the municipal court of Shakopee, Minnesota, and represented to the court that at the time of the alleged offense petitioner "was erroneously relying upon his chauffeur's license as his right to drive an automobile after suspension of his driver's license." It further appears from the record, as reflected in an affidavit by petitioner's attorney, that he "induced the [petitioner] to reinstate his driver's license, file a financial responsibility policy, and subsequent thereto and before the trial of said cause, said [petitioner] filed a financial responsibility policy and his driver's license was reinstated." Petitioner contended in municipal court that the offense was "made under a misapprehension of law and a more or less technical violation" and his attorney "suggested" that he

would advise his client to enter a plea of guilty to the offense providing the court would recommend that his driver's license be not disturbed.

It appears that petitioner was given a 90-day suspended sentence by the municipal court and it was recommended by the court that his driver's license not be suspended. Notwithstanding this recommendation, petitioner's license was again suspended for a period of 1 year by the director of drivers' licenses. Petitioner then instituted proceedings in the district court for an order to vacate and cancel the order of the director of drivers' licenses. After a hearing in district court an order was made denying the petition. The appeal from the judgment entered on that order presents several issues involving the construction and interpretation of certain provisions of c. 169 (Highway Traffic Regulation), c. 170 (Safety Responsibility), and c. 171 (Drivers Licenses).

■ The first point raised by petitioner is directed to the provision of § 171.18(4) which gives the commissioner authority to suspend the license of a "habitual violator of the traffic laws." He argues that the term "habitual violator" is vague and does not provide a clear and precise standard for the guidance of the commissioner in acting upon the suspension of drivers' licenses, and is therefore unconstitutional and void. We have held that discretionary power may be delegated to administrative officers "[i]f the law furnishes a reasonably clear policy or standard of action which controls and guides the administrative officers in ascertaining the operative facts to which the law applies, so that the law takes effect upon these facts by virtue of its own terms, and not according to the whim or caprice of the administrative officers." Lee v. Delmont, 228 Minn. 101, 113, 36 N. W. (2d) 530, 538; 3 Dunnell, Dig. (3 ed.) § 1600(b); Reyburn v. Minnesota State Board of Optometry, 247 Minn. 520, 78 N. W. (2d) 351; State ex rel. Brown v. Johnson, 255 Minn. 134, 96 N. W. (2d) 9.

There are, however, exceptions and qualifications to the rule that a statute which vests discretion in a public official must prescribe precise rules of action. The modern tendency is to be more liberal in permitting grants of discretion to administrative officers in order to

facilitate the administration of laws as the complexity of economic and governmental conditions increase.[1] The rule which requires an expressed standard to guide the exercise of discretion is subject to the exception that where it is impracticable to lay down a definite comprehensive rule—such as, where the administration turns upon questions of qualifications of personal fitness, or where the act relates to the administration of a police regulation which is necessary to protect the general health, welfare, and safety of the public—it is not essential that a specific prescribed standard be expressly stated in the legislation.[2] This is so because it is impossible for the legislature to deal directly with the many details in the varied and complex conditions on which it legislates, but must necessarily leave them to the reasonable discretion of administrative officers.[3]

With respect to the standard expressed by the words "habitual violator," it may be said that there is a division among the courts of the various states as to the validity of traffic and license laws using that term. In Harvell v. Scheidt, 249 N. C. 699, 706, 107 S. E. (2d) 549, 554, the Supreme Court of North Carolina considered a statute identical to ours so far as the relevant subclause is concerned. The court held that such a statute "does not contain any fixed standard or guide to which the Department must conform in order to determine whether or not a driver is an habitual violator of the traffic laws." The Supreme Court of South Carolina, in construing a statute more similar to § 171.18(3) than to § 171.18(4), which is involved in this case,

---

[1] Annotation, 92 A. L. R. 410.

[2] Annotations, 12 A. L. R. 1447, 54 A. L. R. 1110, and 92 A. L. R. 410.

[3] As a guide in determining whether a driver is a habitual violator, the Highway Department has adopted a point system. It appears that at the time defendant's license was suspended, suspension was automatic whenever 12 points were accumulated. Minnesota Point System, Form 3341, 500M, 7-55. Driving after suspension of one's driver's license causes the entry of 12 points on the driver's record. The length of suspension—from 30 days to 1 year—depends on the seriousness of the violation and the particular individual's record over the preceding 5 years. This procedure has been liberalized or made more flexible by recent modifications of the point system.

also held, with reasoning and authority similar to that of the North Carolina court, that the term "habitual" is an inadequate standard. South Carolina State Highway Dept. v. Harbin, 226 S. C. 585, 86 S. E. (2d) 446. It may also be noted that the legislatures of other states have, by statute, enacted a more specific rule. The states of Texas, Missouri, and Florida have by legislative specification defined a habitual violator by the number of his offenses, and the legislatures of North and South Carolina, following the decisions above referred to, have by legislative enactment established a point system for guidance of the commissioner in determining the status of a licensee as a habitual violator.

The sufficiency of the standard expressed by the term "habitual violator" must be viewed in light of the purpose for which the statute was enacted. It should be realistically conceded that in carrying out the objects of the statute the commissioner is required to make judgments based upon many and varied factors involving a great amount of detail. It is not unreasonable to assume that the legislature may well have considered that to prescribe a more specific standard would only place the commissioner in a straitjacket and interfere with the fair and efficient administration of his duties. It appears from oral argument that for the year 1962 there were 53,610 actions taken by the commissioner on suspension and revocation of licenses which involved 10,430 presuspension interviews.[4] In dealing with this vast area of administrative action, a flexible and practical guide is necessary.

The New York court recognized this fact in Ross v. Macduff, 309

---

[4]The latest official Biennial Report of the commissioner of highways of Minnesota, covering July 1, 1958, to June 30, 1960, contains the following statement with reference to disciplinary actions:

"Some 326,348 reports of convictions for violations were received, processed and entered on individual driver records. Of these, 113,220 drivers having accumulated from six to 11 points under the point system were sent warning letters; 20,008 licenses were revoked, 17,136 of these for drunken driving; and 91,446 cases resulted in license suspension or other disciplinary action. Of the total suspensions, 42,001 resulted from failure to comply with provisions of the Minnesota Safety Responsibility Act."

N. Y. 56, 127 N. E. (2d) 806. In that case they considered a license suspension provision under the following statute:

"3. Permissive suspensions and revocations. Such licenses * * * may be suspended or revoked:

"(d) for habitual or persistent violation of any of the provisions of this chapter, or of any lawful ordinance, rule or regulation made by local authorities in relation to traffic." 62A McKinney's Consol. Laws of New York Ann., Vehicle and Traffic Law, § 71 (now § 510), subd. 3, par. [d].

It appears that as in Minnesota the commissioner of motor vehicles in New York has established a point system without specific statutory authorization, as a practical guide in determining when a driver is to be considered a habitual violator. In discussing the same situation with which we are here faced, the New York court said (309 N. Y. 59, 127 N. E. [2d] 807):

"The petitioner attacks the determination [of the hearing commissioner] on various grounds, principal of which is the alleged unconstitutionality of section 71 (subd. 3, par. [d]) of the Vehicle and Traffic Law, in that legislative functions have been delegated to an administrative body without providing any criteria or standards defining the words 'habitual' or 'persistent'. This is wholly without substance and must be rejected, as such a requirement in respect to the administration of the traffic rules should be left to the reasonable discretion of the administrative official [citations omitted].

"The circumstances under which a licensee may be deemed 'guilty of habitual or persistent violation' vary with the changes in highway conditions, amount of traffic, type of control, power and speed of vehicles, changes in local traffic regulations and ordinances and a myriad of other elements which necessitate the delegation of the formulation of specific rules to administrative officials [citation omitted]."

The rationale expressed by the New York court is in accord with previous decisions of this court. In State ex rel. Brown v. Johnson, 255 Minn. 134, 140, 96 N. W. (2d) 9, 14, we pointed out that broad, flexible standards may be necessary for the effectuation of legislative

policy, and that standards may be expressed in broad terms where more precise and rigid standards could well destroy "the administrative flexibility necessary to effectively carry out the legislative purpose" comprehended by the law. We cited Lee v. Delmont, *supra,* to the effect that what is a sufficiently definite declaration of policy and standard varies in degree according to the complexity of the subject to which the law is applicable.

As the New York court pointed out in Ross v. Macduff, *supra,* denial of any discretion to the highway commissioner would prevent consideration of many factors which are relevant to the regulation of unsafe drivers on our highways. Considering the numerous relative factors which are important to consider in making his determination, there is not here an unreasonable delegation of authority to the commissioner. See, also, Spurbeck v. Statton, 252 Iowa 279, 106 N. W. (2d) 660.

■ The next point stated in petitioner's brief is: "Traffic laws, financial responsibility laws and drivers license laws, contained respectively in Chaps. 169, 170 and 171 of the statutes, are different laws or acts, and violations of provisions of Chaps. 170 and 171 are not covered as grounds for suspension under Sec. 171.18, M. S. A." The thrust of this point is that violations of those provisions of the law which pertain to the possession, suspension, and revocation of drivers' licenses do not relate to "traffic laws" within the purview of § 171.18(4). The petitioner seems to conclude that if those violations relating to suspension and revocation of his license are eliminated from his driver's record, a sufficient number would not remain to characterize him as a habitual violator. We may dispose of this point by observing that Minn. St. c. 169 (Highway Traffic Regulation), c. 170 (Safety Responsibility), and c. 171 (Drivers Licenses) relate to the regulation of vehicular traffic, and their general purpose comprehends that unsafe drivers be kept off our highways. Although a violation of a provision of c. 171 does not in itself impair safety on our highways, driving after suspension or revocation of a license can reasonably be considered to be evidence of an irresponsible attitude toward laws concerning the operation of motor vehicles, which in turn is

strong evidence that the driver in question continues to be an unsafe driver. The overriding object of these laws is to protect the public in the rightful use of highways. We are of the view that in carrying out the legislative purpose of securing highway safety, the commissioner may properly consider driver's license laws to be "traffic laws" within the meaning of § 171.18.

Moreover, it should be noted that § 171.16 incorporates a guide as to the meaning of the term "traffic laws." That section provides that the courts of this state shall forward to the Highway Department records of convictions of violations of "any law of this state regulating the operation of motor vehicles on streets or highways," except parking violations. The driver's license laws appear to be included among such laws since they state conditions which must be met in order to lawfully operate a motor vehicle on streets and highways. Since these reports are used by the highway commissioner in deciding on suspensions, § 171.16 would be a nullity so far as driver's license laws are concerned if violations of these laws cannot be a basis of suspension.

The Supreme Court of Washington recently construed a similar statute in State ex rel. Ralston v. Dept. of Licenses, 60 Wash. (2d) 535, 374 P. (2d) 571. There the question was whether reports of convictions in municipal courts could be considered by the Department of Licenses in suspending drivers' licenses. The court said (60 Wash. [2d] 541, 374 P. [2d] 575):

"* * * The reporting statutes, * * * require the transmission of records of all convictions to the Department of Licenses for designated purposes, among which is included possible use as a basis for suspension of operator licenses. To conclude that the Director may not consider these reports and use them as a basis for ordering suspension would relegate these statutes to ministerial nuisances insofar as convictions in municipal courts are concerned."

■ Petitioner's argument that the suspension here violates constitutional prohibitions against double jeopardy[5] is of no merit as it is

---

[5]Minn. Const. art. 1, § 7, provides in part: "No person shall be held to answer for a criminal offense without due process of law, and no person for the same offense shall be put twice in jeopardy of punishment * * *."

well established that suspension or revocation of a license is not a punishment but is rather an exercise of the police power for the protection of the public. State ex rel. Connolly v. Parks, 199 Minn. 622, 273 N. W. 233; Butler v. Commonwealth, 189 Va. 411, 53 S. E. (2d) 152; Commonwealth v. Harris, 278 Ky. 218, 128 S. W. (2d) 579; Cooley v. Texas Dept. of Public Safety (Tex. Civ. App.) 348 S. W. (2d) 267; Prawdzik v. City of Grand Rapids, 313 Mich. 376, 21 N. W. (2d) 168, 165 A. L. R. 1165; and State v. Amick, 173 Neb. 770, 114 N. W. (2d) 893.

Permission to operate a motor vehicle upon the public highways is not embraced within the term "civil rights" and is in the nature of a license or privilege. While the privilege is a valuable one, and may not be unreasonably or arbitrarily taken away,[6] its enjoyment depends upon compliance with conditions prescribed by law and is always subject to such regulation and control as public authority may see fit to impose under the police power in the interest of public safety and welfare.[7] It may also be observed that since no action has been taken to revoke the defendant's chauffeur's license, his right to continue in his employment has not been affected.

Nor can we agree with petitioner that he has been denied a proper hearing. Petitioner was provided a hearing before a representative of the Highway Department on May 14, 1962. The matter was later reviewed by proceedings in district court. A hearing need not take place before the administrative decision is made, provisions for appeal to the district court being all that is required. Wolfe v. State Board of Medical Examiners, 109 Minn. 360, 123 N. W. 1074; Zalk & Josephs Realty Co. v. Stuyvesant Ins. Co. 191 Minn. 60, 253 N. W. 8; Fisch v. Sivertsen, 208 Minn. 102, 292 N. W. 758. The other points raised by petitioner do not require discussion.

Affirmed.

---

[6]State v. Moseng, 254 Minn. 263, 95 N. W. (2d) 6.
[7]7 Am. Jur. (2d) Automobiles and Highway Traffic, § 97, p. 668.